[No. 16800-2-I. Division One. August 12, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. MARK WAYNE CLARK, *Appellant.*

852

*Mark Wayne Clark,* pro se, and *Rita J. Griffith* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney, Linda Jacke, Deputy,* and *Tziviah Goldberg, Legal Intern,* for respondent.

SWANSON, J.—Mark Wayne Clark appeals from his conviction for first degree murder while armed with a firearm. Clark challenges a warrantless search of his belongings, a pretrial photo identification, testimony by a key state witness pursuant to an immunity agreement, and the admission of evidence of prior "bad acts." We affirm.

Mark Wayne Clark was charged by information filed November 27, 1984, with first degree murder while armed with a firearm. The victim, Daniel Conklin, was found at about 6 a.m. on April 15, 1984, slumped behind the wheel of his car; the car had crashed into a boat parked at 3304 S. 192nd in Seattle. Conklin had been shot twice in the head

and once in the chest. Neighbors reported hearing several shots, but no one witnessed the killing. At about 5:10 a.m. that morning, Conklin told his roommate, Herbert Battell, that someone named "Mike" had just telephoned with car trouble and needed a ride home.

In November 1984, while investigating a fire in which Jackie Notter, Clark's former girl friend, had died, police learned that Michael Brown, Clark's former roommate and Notter's current boyfriend, had information about Conklin's death. Brown eventually entered into two immunity agreements and became a key State witness at trial.

According to Brown, he and Clark spent the late evening and early morning of April 14–15 together. The two men consumed various combinations of marijuana, Valium, and alcohol. After both were injured in a scuffle near the Pike Place Market, they drove home in Brown's pickup truck. Brown then worked for a while in the "grow room" on some marijuana plants.

Brown overheard a telephone call during which Clark told someone he would "see you in a bit." Clark then asked Brown to drop him off at the Albertson's parking lot in Burien. After dropping off Clark, Brown waited in his truck on a dead–end street near Angle Lake. Brown testified that he occasionally transported Clark for drug transactions to pay off his own drug debts to Clark.

After about 30 minutes, Clark returned to the truck and said something like "let's go" and "I shot him." Clark had his coat wrapped around a gun. Despite Clark's instruction to drive straight ahead, Brown turned left at the next intersection and noticed a boat that appeared to be off its trailer. After passing a few more houses, Clark told Brown to stop and jumped out of the truck. Brown heard two shots and Clark returned, saying something to the effect of "I shot him again."

The two returned home and decided to take the ferry to Vashon Island, where Clark burned his clothes. According to Brown, Clark threw his gun overboard on the trip. Brown later brought the investigating officer, Detective

Gillis, to a fire site on Vashon Island and some physical evidence was recovered. On the day after the killing, Brown had his truck repainted at Clark's insistence. At trial, Brown admitted that he had originally lied to police about some of the details of his story, such as where he had dropped Clark off before the shooting.

Clark's version of the events differed substantially from Brown's. According to Clark, after the two returned home from the fight at the Pike Place Market, Brown made a phone call and left hurriedly. Clark then went to sleep and was awakened by a telephone call from his mother at about 7 a.m.

At trial several witnesses testified that Clark had told them of his plans to "get" a man who had allegedly raped Jackie Notter sometime in 1982. Greg Westford testified that Clark told him that he, Clark, had once been propositioned by the same man. Clark later told Westford that he had "taken care" of the man and showed Westford the location of the killing.

Clark originally told police he did not know Conklin. At trial, Clark testified Brown had told him that the description of the man who raped Notter sounded like the same man who had once propositioned Brown. Brown then gave Conklin's business card and telephone number to Clark. Clark subsequently took pictures of Conklin in his shop and showed them to Notter, who said it was not the same man. Notter later told Clark it was the same man.

Expert testimony established that Conklin had been killed with a .38 caliber gun, mostly likely a Rohm revolver. Val Farmer testified he had loaned Clark a Rohm Special .38 revolver several years prior to the shooting. There was some testimony that Clark had gone shooting with friends in July 1984 with the same gun he had always owned. Clark claimed his gun turned up missing in November 1984 at the time he moved out of the house he shared with Brown; Brown had moved out in August 1984.

Prior to trial, Dan Mangini, a friend of Conklin, identified Clark's picture from a photo montage as that of a man

he had seen twice in Conklin's hairdressing shop 2½ years earlier. Also prior to trial, Brown's attorney turned over to Detective Gillis two open boxes of items belonging to Clark. The boxes contained negatives of Conklin taken by Clark and a notebook with the name "Dan" and Conklin's telephone number. Gillis searched the boxes without obtaining a warrant. Following trial, which began on May 22, 1985, a jury found Clark guilty as charged. The jury also returned a special verdict that Clark was armed with a firearm.

Clark first contends the trial court erred in failing to suppress photographic negatives and a notebook containing the name "Dan" and Conklin's telephone number that were found in two boxes of Clark's belongings by Michael Brown and subsequently turned over to Detective Gillis. The two boxes were recovered by Brown in March 1985 from a storage shed.

At the time the boxes were placed in the shed by Clark and Brown, about 1 year prior to the search, a Martin Woodcock was renting the nearby house and Brown had been storing his own things in the shed. Although the shed had been locked at some point, and Woodcock, Brown, and Clark had keys, the shed was open and in a state of disrepair at the time the boxes were removed, and the house was vacant. After keeping the boxes for about 2 weeks, Brown turned them over to his attorney, who gave them to Detective Gillis on April 22, 1985. Even if we assume that Brown's conduct constituted an unreasonable intrusion into Clark's affairs, the evidence was properly admitted.

 Fourth Amendment guaranties against unreasonable searches and seizures do not require exclusion of evidence obtained from private citizens acting on their own initiative. *Burdeau v. McDowell,* 256 U.S. 465, 65 L. Ed. 1048, 41 S. Ct. 574, 13 A.L.R. 1159 (1921); *State v. Ludvik,* 40 Wn. App. 257, 262, 698 P.2d 1064 (1985). Article 1, section 7 of the Washington Constitution affords no more protection from private searches than does the Fourth Amendment. *State v. Dold,* 44 Wn. App. 519, 525, 722 P.2d 1353 (1986); *Ludvik.* Constitutional protections may apply, however, if

the private person functions as an agent or instrumentality of the State. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971).

Whether or not a person is acting as the State's instrumentality depends on the particular circumstances of the case. *State v. Dold, supra; see generally* 1 W. LaFave, *Search and Seizure* § 1.8 (2d ed. 1987). Before a private party may be deemed an agent of the State, however, the government must be involved directly as a participant in the search or indirectly as an "encourager" or instigator of the private citizen's actions. *United States v. Walther,* 652 F.2d 788, 791 (9th Cir. 1981). Critical factors in determining whether a private person acts as a government agent include whether the government knew of and acquiesced in the intrusive conduct and whether the party performing the search intended to assist law enforcement efforts or to further his own ends. *United States v. Snowadzki,* 723 F.2d 1427, 1429 (9th Cir. 1984) (quoting *United States v. Miller,* 688 F.2d 652 (9th Cir. 1982)). The burden to establish government involvement in a private search rests on the defendant. *Snowadzki. Cf. Dold.*

Clark does not contend the police knew of or acquiesced in the search by Brown. Rather, Clark asserts the police "encouraged" Brown to undertake the illegal search by means of the immunity agreements and by other pre—search contacts. Although Brown's recollection was hazy, he testified that he told Detective Gillis about photos Clark had taken of the man who allegedly raped Jackie Notter. Gillis told Brown the photos would be "significant" and "to just let him know" if Brown heard any more. The mere fact that there are contacts between the private person and police does not make that person an agent. *United States v. Lambert,* 771 F.2d 83, 89 (6th Cir. 1985). Brown and the police did not have such a close working relationship that the search might be viewed as a "joint action." *See State v. Birdwell,* 6 Wn. App. 284, 492 P.2d 249, *review denied,* 80 Wn.2d 1009 (1972). Nor do Detective Gillis's statements to Brown that a picture would be "significant" and to let him

know if Brown heard more rise to the level of encouragement. *See, e.g., Snowadzki* (no agency when fellow employee of defendant asked IRS agent whether defendant's records would be "helpful" to investigation and agent replied "yes"). Gillis had no knowledge that the boxes existed until they were turned over to him by Brown's attorney.

Brown stated that his primary motivation for searching through the boxes was to destroy pornographic photos Clark had taken of Jackie Notter. While Brown also may have felt that turning over the evidence would be helpful to him and might aid the police, such unilateral conduct cannot turn him into an agent. *See Snowadzki; Dold; State v. Sweet,* 23 Wn. App. 97, 596 P.2d 1080 (mere purpose to aid government is insufficient to transform private search into government search), *review denied,* 92 Wn.2d 1026 (1979). The record provides no indication that Gillis intended to encourage Brown, either expressly or tacitly, to undertake action that the police themselves could not. Nor is there evidence that Gillis might foresee Brown would undertake an illegal search. *See, e.g., Miller.* Under the circumstances of the instant case, we agree with the trial court that Brown was acting in a private capacity when he searched the boxes.

In situations in which an agency relationship has been found, substantially more pre-search contact and encouragement was involved than in the instant case. *See, e.g., United States v. Walther, supra* (airline employee had functioned on 11 previous occasions as a Drug Enforcement Agency informant); *United States v. Stein,* 322 F. Supp. 346 (N.D. Ill. 1971) (government encouraged private party's action by giving impression that cooperation would result in the party being omitted from an indictment).

Clark next argues that even if Brown was not acting as the State's agent, part of the evidence discovered by Detective Gillis during the subsequent search, namely the notebook with Conklin's name and telephone number on it, should have been excluded. When the results of a private

search are turned over to the State, a search that does not exceed the scope of the prior private search does not violate constitutional prohibitions. *United States v. Jacobsen,* 466 U.S. 109, 80 L. Ed. 2d 85, 104 S. Ct. 1652 (1984); *State v. Dold, supra; State v. Bishop,* 43 Wn. App. 17, 714 P.2d 1199 (1986). Clark contends that Gillis exceeded the scope of the prior search because Brown was looking primarily for photographic negatives and, in fact, turned the negatives over to Gillis separately from the boxes themselves. However, even though Brown's search of the boxes was extensive, we need not decide whether Detective Gillis could legitimately have looked at everything because at the time the boxes were turned over to him, the challenged notebook was in plain view and Detective Gillis was able to read the name and telephone number without moving anything. Consequently, as to the notebook, the subsequent search was not more intrusive than the prior private search. *See United States v. Jacobsen,* 466 U.S. at 116 (quoting *Walter v. United States,* 447 U.S. 649, 65 L. Ed. 2d 410, 100 S. Ct. 2395 (1980)). The evidence was properly admitted.

Clark next contends the trial court erred by failing to suppress Brown's testimony. Relying on *Franklin v. State,* 94 Nev. 220, 577 P.2d 860 (1978) and *People v. Medina,* 41 Cal. App. 3d 438, 116 Cal. Rptr. 133 (1974), Clark argues that certain conditions in the April 22, 1985, immunity agreement coerced Brown into testifying to a specific set of facts.[1] In exchange for Brown's cooperation, the State

---

[1]The immunity agreement took the form of a letter to Brown's counsel and requested the following performance:

"(1) That he will promptly provide a complete and truthful statement concerning the killing of Daniel Conklin to Detective Michael Gillis of the King County Major Crimes Unit. We would promise not to use any statement made by Mr. Brown in that interview against him in the event he is charged for his involvement in that crime. This grant of use immunity presupposes and is conditioned expressly upon your client's willingness to be totally truthful with Detective Gillis;

"(2) That he will testify truthfully in any such hearing, proceeding or trial connected with this matter;

"(3) That the complete and truthful statement which Mr. Brown gives and upon which the State relies confirms that he did not have prior knowledge that a

promised not to charge Brown with any crime arising out of Conklin's death.

In *People v. Medina, supra,* the court held that an immunity agreement conditioned upon witnesses "not materially or substantially" changing their testimony from a prior tape–recorded statement placed the witnesses under a "strong compulsion" to testify in a particular fashion, thereby depriving the defendants of any meaningful cross examination and, consequently, of their right to a fair trial. *Medina,* 116 Cal. Rptr. at 146. In *Franklin,* the prosecution plea bargained with an accomplice to murder in order to obtain specific testimony implicating the defendant and then withheld the benefit of the bargain, *i.e.,* a plea to a lesser charge, until the witness performed at trial. The court held that such compulsion so tainted the witness's testimony as to constitute a due process violation. We have cited *Franklin* with approval in *State v. Brown,* 29 Wn. App. 770, 630 P.2d 1378, *review denied,* 96 Wn.2d 1013 (1981).

When viewed in its entirety, the April 22 immunity agreement did not impermissibly coerce Brown to testify in a certain manner. The agreement required Brown to give "a complete and truthful" *statement* concerning Conklin's death, confirming that he did not have prior knowledge of the killing, did not commit the murder, and did not aid in the commission of the murder. Such a requirement not only gave some assurance of reliability to the State, but also served to set forth clearly the basis of the parties' agreement. However, the conditions imposed did not require Brown's *testimony* to conform to a particular sequence of events, as was the case in *Medina.*[2]

Obviously Brown had some incentive to reaffirm his ver-

---

homicide was to occur, that he did not commit the homicide, and that he in no way aided and abetted in the commission of the homicide."

[2]Clark asserts that "statement" as used in section (3) was defined in the agreement to mean trial testimony. However, this definition is used only in the second part of the agreement and appears in the context of a promise not to use

sion of the events as already told to the police. However, although Brown changed certain details as time went on, the trial court recognized that his account regarding the circumstances set forth in the immunity agreement— namely that he did not know of the murder in advance and did not assist in the murder—was consistent from the very beginning. Just because an immunity agreement rests on a premise that the requested testimony will be of some benefit to the State, the agreement is not necessarily rendered impermissibly coercive. Such agreements must be beneficial to both sides, or there would be no reason to enter into them. *See People v. Meza,* 116 Cal. App. 3d 988, 172 Cal. Rptr. 531 (1981).

Under the terms of the immunity agreement, the State's promises did not extend to false or misleading statements or perjury. Thus, while the agreement provided some incentive for Brown to confirm his prior accounts of the killing, it provided an equal incentive that he not enter into the agreement at all unless the statement was in fact the truth. Brown's attorney testified that he made this clear to Brown. This aspect of the immunity agreement distinguishes it from that involved in *Medina,* in which the only condition was that the witnesses' testimony not vary substantially from a prior recorded statement. Nor is the State's promise not to charge an inducement that is "withheld" until the witness performs as expected, as was the case in *Franklin,* in which the prosecution permitted a murderer to plead guilty to a lesser charge only after he had given the expected testimony.

In summary, we conclude that the immunity agreement in the instant case was not improperly conditioned on testimony setting forth a particular formulation of the facts or on the achievement of a certain result. *See People v. Meza,* 172 Cal. Rptr. at 534. Brown was not coerced to testify in other than a truthful manner and his testimony was prop-

---

Brown's statements against him. "Statement" as used in section (3) clearly refers only to the statement required in section (1).

erly admitted.

Clark next contends that the trial court erred in failing to suppress the identification testimony of Dan Mangini because Clark's counsel was not present when Mangini identified Clark's picture in a photo montage as that of a man he had twice seen in Conklin's shop 2 to 3 years previously. Clark concedes that the Sixth Amendment right to counsel does not require the presence of counsel at post–charging photo identification procedures, even if the defendant is in custody and available for a corporeal lineup. *State v. Nettles*, 81 Wn.2d 205, 500 P.2d 752 (1972). The United States Supreme Court subsequently reached the same result. *United States v. Ash*, 413 U.S. 300, 37 L. Ed. 2d 619, 93 S. Ct. 2568 (1973). On appeal, Clark contends that article 1, section 22 of the Washington Constitution should be read to provide such a right.

■ Recently our Supreme Court indicated that the right to counsel under our state constitution is coextensive with that right as provided under the Sixth Amendment: "it is only at a critical stage that the Sixth Amendment and Const. art. 1, § 22 (amend. 10) right to counsel is provided in order to ensure the effective preservation and preparation of defenses to the charges." *Heinemann v. Whitman Cy.*, 105 Wn.2d 796, 800, 718 P.2d 789 (1986); *see also State v. Guzman–Cuellar*, 47 Wn. App. 326, 734 P.2d 966 (1987).

Clark argues that there is no persuasive theoretical or logical basis for requiring counsel at post–charging corporeal lineups but not at post–charging photo lineups. Clark argues that the potential for suggestiveness is equally present during photo identifications. As a consequence, Clark maintains, there is little incentive for police to conduct corporeal lineups where counsel is necessary. These arguments, however, apply equally to analysis based on the federal constitution and provide no basis for an expansive reading of Const. art. 1, § 22 (amend. 10). Similar arguments were considered and rejected in *Nettles*.

The court in *Nettles* held that a post–charging photo

identification, unlike a corporeal lineup, is not a "critical stage" of a criminal proceeding because it involves no actual confrontation at which the presence of counsel is necessary to protect the rights of the accused. *Nettles,* at 208. Moreover, any infirmities in the identification process, including suggestive procedures, can be adequately and effectively explored at trial. Finally, the court noted that if the nature or type of the photographs is prejudicial, the presence of counsel would not provide any significant additional protection of the defendant's rights. *Nettles.* Because Clark's primary arguments provide no basis for distinguishing the right to counsel under our state constitution from that right as set forth in the Sixth Amendment, his citation to decisions in other jurisdictions in which the courts have rejected the analysis underlying *Nettles* and *Ash* and required the presence of counsel at post–charging photo lineups is unpersuasive.

Clark also relies on two of the criteria set forth in *State v. Gunwall,* 106 Wn.2d 54, 58, 720 P.2d 808 (1986) to support a broader reading of Const. art. 1, § 22 (amend. 10), namely "preexisting state law" and "matters of particular state or local concern." We find these arguments equally unpersuasive.

As to the criterion of "preexisting state law," our Supreme Court has already indicated that the right to counsel under the state constitution is coextensive with that right under the federal constitution. *Heinemann.* In *Nettles,* the court held that the Sixth Amendment did not require the presence of counsel at a post–arrest photoidentification procedure. Nor does the fact that court rules may, in certain circumstances, provide a right to counsel when the constitutional right has not yet attached indicate that the right to counsel is of local rather than national concern, such that the state constitutional provision should be read more broadly. *See* CrR 3.1; JCrR 2.11; *see also State ex rel. Juckett v. Evergreen Dist. Court,* 100 Wn.2d 824, 675 P.2d 599 (1984); *Heinemann; State v. Fitzsimmons,* 93 Wn.2d 436, 610 P.2d 893, 18 A.L.R.4th 690,

*vacated,* 449 U.S. 977, *aff'd on remand,* 94 Wn.2d 858, 620 P.2d 999 (1980). We have recently observed that the right to counsel as provided in the court rules is not of constitutional origin. *State v. Guzman–Cuellar, supra* at 334 (allegation that defendant had right to counsel under CrR 3.1 could not be raised for first time on appeal). Consequently, we find no basis for concluding that article 1, section 22 of the Washington Constitution requires the presence of counsel during a post–charging photo identification procedure.

Clark next contends the trial court erred by admitting evidence of Clark's use, propagation, and sale of marijuana. He argues that the evidence was not relevant to the question of who killed Conklin and that, even if relevant, the prejudicial effect far outweighed the minimal relevance.

Evidence of prior "bad acts" is admissible under ER 404(b) when logically relevant to a material issue and if its potential for prejudice does not substantially outweigh its probative value. *State v. Saltarelli,* 98 Wn.2d 358, 655 P.2d 697 (1982). The trial court has broad discretion in determining admissibility under ER 404(b), and its judgment will be overturned only for manifest abuse of discretion. *State v. Gatalski,* 40 Wn. App. 601, 610, 699 P.2d 804, *review denied,* 104 Wn.2d 1019 (1985).

Although the trial judge noted that the evidence was "to some extent inflammatory," we agree that the probative value outweighed any prejudicial effect. As a key State witness, Brown's explanation of the events from the time of the Pike Place Market incident through the time of the killing was crucial. Brown's and Clark's testimony differed substantially as to these events. Brown's own use of drugs during this period was important for an assessment of his memory of events and his overall credibility. The fact that Brown thought he was transporting Clark on a drug deal, something he had done before, tended to reinforce his version of the events as well as negate Clark's explanation. *See State v. Traweek,* 43 Wn. App. 99, 105, 715 P.2d 1148 (testimony regarding attempted raid on marijuana farm estab-

lished chain of events leading to charged robbery later that day and placed defendant near scene of robbery), *review denied,* 106 Wn.2d 1007 (1986); *State v. Bockman,* 37 Wn. App. 474, 682 P.2d 925 (evidence of prior bad acts may be admissible to complete story of crimes by proving immediate context of happenings near in time and place), *review denied,* 102 Wn.2d 1002 (1984).

Clark's and Brown's drug usage was "part of the fabric of events" leading up to the murder. The jury's assessment of this evidence in its proper context was important. *Cf.* 5 K. Tegland, Wash. Prac. § 226 (2d ed. 1982). The trial judge's comments in this regard are pertinent:

> Brown's conduct is at issue through all of this and his explanation as to why he did nor didn't do certain things are fairly examined into by I think both parties.
>
> To sterilize his conduct by limiting certain testimony while having negative implications for both himself and Mr. Clark, I think have the potential for skewing the assessment by the trier of fact of testimony in this case.

We find no abuse of discretion.

Clark next contends the prosecutor committed reversible misconduct by eliciting evidence of prior "bad acts" by Clark during rebuttal testimony in direct violation of the trial court's orders. Greg Westford testified that after Conklin's death, Clark on occasion "would take [Jackie Notter's] clothes and all her money and keep her there and wouldn't, physically wouldn't let her out of the house." Dale West testified that once, after Conklin's death, Clark had "smacked" Notter. No objection was raised to Westford's statement; an objection to West's statement was overruled.

■ The question to be resolved in a case involving alleged prosecutorial misconduct is, upon examination of the entire record, whether there is a substantial likelihood that misconduct affected the jury verdict, denying the defendant a fair trial. *State v. Davenport,* 100 Wn.2d 757, 762, 675 P.2d 1213 (1984).

At first glance, the rebuttal questioning appears to vio-

late the "ground rules" of the trial, repeatedly agreed to by both sides, that evidence of other bad acts would not be introduced without prior court clearance. However, even if we assume that the prosecutor's actions constituted misconduct, the error does not require reversal.[3] While the relevance of the rebuttal testimony is marginal at best, and the evidence tends to portray Clark as a somewhat violent person, Clark himself testified that the couple had a stormy relationship, stating that the two "were fighting almost every day" just prior to Conklin's death. Moreover, the alleged acts were substantially different in character than the charged crime. Consequently, it is highly unlikely that the jury's decision regarding Clark's guilt was in any way affected by the rebuttal testimony.

In his pro se brief, Clark also challenges the admissibility of Mangini's identification of Clark's photo in the photo montage. A defendant who asserts that a police identification procedure denied him due process must show

---

[3]Although we assume for purposes of our decision that the prosecutor's action violated the "ground rules" of the trial regarding the introduction of evidence of prior bad acts, the record of the rebuttal testimony tends to belie such an assumption. As already indicated, no objection was raised to the challenged testimony of Westford. Appellant argues that no objection was necessary to preserve the issue because he had a standing objection to evidence of any prior bad acts unless it was first cleared with the court. Whether or not the evidentiary issue was preserved for appeal, a question we do not resolve, the contention on appeal is prosecutorial misconduct. Even if appellant was not required to raise a formal objection to the testimony, we can find no basis for relieving a party of the obligation to request a curative instruction. Absent such a request, any error is waived unless the prosecutor's actions are deemed flagrant and ill intentioned and the resulting prejudice so enduring that the effect could not be neutralized by a jury admonition. *See State v. Sargent,* 40 Wn. App. 340, 345, 698 P.2d 598 (1985). Here the record reveals no motion for a mistrial, request for a curative instruction, or any further argument that the rebuttal testimony was improper. Moreover, the prosecutor referred during closing argument to the testimony challenged on appeal and no objection was raised.

Appellant's counsel did object to West's testimony that he had seen Clark "smack" Notter. However, the objection was overruled. Throughout the long and complex trial, the conscientious and careful trial judge showed great concern for the potential prejudice that could result from evidence of other bad acts. The fact that he overruled the objection is a strong indication that he did not believe the questioning was in violation of the "ground rules."

that the procedure was unnecessarily suggestive. *State v. Traweek, supra* at 103. Once such a showing is made, the court reviews the totality of the circumstances to determine whether the suggestiveness created a substantial likelihood of irreparable misidentification. *Manson v. Brathwaite,* 432 U.S. 98, 116, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977); *State v. Guzman–Cuellar, supra.* Here we do not reach the second stage of the analysis because Clark has failed to show that the procedure was unnecessarily suggestive.

Clark does not allege that the photo montage itself or the procedures used to show it to Mangini were suggestive. Rather, Clark's argument is based on the fact that Mangini had referred Detective Gillis to a Jerry Watson, a friend of Conklin's who might be able to establish a connection between Clark and Conklin. Watson was shown the photo montage and was unable to identify anyone, even when Clark's photo was specifically pointed out to him. Watson's whereabouts were unknown at the time of trial. However, because Clark's photo was in the same position 2 months later when Mangini identified Clark and because Mangini had expressed to Detective Gillis a desire to view the montage, Clark surmises that Watson may have told Mangini of the position of Clark's photo and thus tainted the identification. Because there is no evidence in the record to support such an allegation, Clark has failed to carry his initial burden of demonstrating that the identification procedure was unnecessarily suggestive.

Clark next alleges that repeated instances of prosecutorial misconduct denied him a fair trial. He contends the prosecutor improperly brought out evidence of prior bad acts during the testimony of Brown, Clark, Westford, and Nick and Crystal Torres. In addition, Clark maintains that the prosecutor improperly suggested that Clark may have had a second gun and theorized that Clark had a sexual relationship with Conklin. After carefully examining the context of each of the challenged remarks, we find no reversible error. In some instances no objections were raised; in others, the questioning was proper. In cases in

which an objection to a challenged remark was sustained, no curative instruction was requested. The prosecutor's remarks during closing argument were based on reasonable inferences to be drawn from the evidence and did not amount to an expression of a personal opinion.

Finally, Clark appears to take issue with his counsels' decision to stipulate that Clark had taken some photographs of Notter that could be characterized as pornographic. There is no indication that Clark disagreed with this tactical decision at the time. In any event, the potential prejudice was limited by the fact that the photographs themselves were not admitted. We find no error. A defendant is entitled to a fair trial, not a perfect trial. Appellant Clark received a fair trial.

The judgment is affirmed.

WEBSTER and PEKELIS, JJ., concur.

Review denied by Supreme Court December 2, 1987.