[No. 41376-7-I.   Division One.   October 3, 2000.]

THE STATE OF WASHINGTON, *Respondent*, v. SHAWN DANIEL SWENSON, *Appellant*.

*David B. Koch* (of *Nielsen, Broman & Associates, P.L.L.C.*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Deborah A. Dwyer, Deputy*, for respondent.

KENNEDY, J. — Shawn Daniel Swenson contends that his conviction of first degree felony murder based on the predicate felony of first or second degree robbery or attempted robbery must be reversed because (1) the victim's father, while acting as a government agent, obtained evidence in violation of the Fourth Amendment that should have been suppressed, together with the fruits of that evidence; and (2) that automatic reversal is required because the accomplice liability instruction, the current WPIC 10.51,[1] relieved the State of its burden to prove all the essential elements of felony murder beyond a reasonable doubt.[2] Substantial evidence supports the trial court's finding that the victim's father was not acting as a government agent. Accordingly, it was not error to refuse to suppress the evidence obtained by the father and the fruits of that evidence. Assuming without ruling that the current version of WPIC 10.51 generally misstates the law of accomplice liability, any such error was harmless beyond a reasonable doubt in this case. Swenson was charged as a principal and the instructions as a whole did not relieve the State of proving any element of first degree felony murder. But even if the jury believed that Swenson was an accomplice to the coparticipant rather than a principal, the error

---

[1] 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51, at 157 (2d ed. 1994).

[2] Swenson's remaining contentions, which are without merit, are treated in the unpublished portion of this opinion.

was still harmless because Swenson admitted during his testimony that he had the requisite intent for robbery, i.e., the intent to commit theft. The state of mind necessary to prove felony murder is the same state of mind necessary to prove the underlying felony. Accordingly, we affirm the conviction.

## FACTS

On March 7, 1995, David Loucks left home for a 7 P.M. meeting at the Seattle recording studio that he owned and operated. The next morning, David Loucks' father, Allan Loucks, Sr., discovered his son's dead body on the floor of the studio with duct tape over his mouth and nose and around his hands and feet. David Loucks' wedding band, keys to the studio, and some of his recording equipment were missing.

### Investigation

Allan Loucks, Sr. (hereinafter Allan Loucks), an attorney, took an immediate interest in helping the police find his son's killer or killers. He suggested investigative strategies that the police should pursue and provided the police with information that he obtained, including information that a "Paul Waller" had an appointment with David Loucks on the evening of March 7, 1995. Detectives Alan Lima and Kevin O'Keefe followed up on many of these leads and kept Allan Loucks informed of their progress.

By June 1995, Allan Loucks decided that the detectives were not competently investigating his son's death. He took time away from his law practice to investigate on his own. Despite instructions from Detective Lima to let the police handle the investigation, Allan Loucks continued to pursue various leads and provide information to the police. By August 1995, this information included driver's license numbers, credit card numbers, birth dates, birth certificates, social security numbers, bank records, insurance information, court documents, and addresses of people that

Allan Loucks thought the police should investigate. Through the end of 1995, Allan Loucks continued to be a consistent source of information for the police.

In January 1996, Allan Loucks met with the police to provide them with some additional names of people to investigate, including Shawn Swenson. In turn, the police updated Allan Loucks on their investigation and exchanged information with him. Shortly thereafter, Allan Loucks provided police with an address and car that he connected to Swenson.

On February 7, 1996, Detective Lima obtained Swenson's driver's license photo, address, date of birth, height, and weight. On February 9, 1996, Allan Loucks provided the police with a sketch, credit information for Swenson, and his social security number. On February 13, 1996, Allan Loucks tipped Detective Lima that Swenson had used a Washington Driver's License with a Florida address at a music store in Spokane.

In March 1996, the police called Allan Loucks to ask for the cellular phone numbers that Allan Loucks thought they should investigate. Allan Loucks called back and said that he did not have any new cellular phone numbers to investigate. He did, however, indicate that he was able to connect Swenson to some stolen recording equipment. Allan Loucks also provided the police with some additional names to investigate.

In the spring of 1996, Allan Loucks received some anonymous information that Swenson had called David Loucks' studio five times in the weeks and days leading up to his son's death. The information included the days, times, and lengths of the calls. Earlier, Allan Loucks had contacted several people in the telephone industry asking for this information. He advised them to provide the information anonymously because he knew that his contacts could not obtain the information legally.

Allan Loucks did not immediately provide the information to police because he was frustrated with how the police

were conducting their investigation. On June 10, 1996, Allan Loucks told police that the key to solving the case was Swenson's phone records and that he believed Swenson was "Paul Waller." Allan Loucks also said that he had a lot of additional information but needed to consult a criminal attorney before releasing it.

On June 18, 1996, Allan Loucks met with police and again advised them that Swenson's phone records were very important to solving the case. In addition, he provided police with information connecting Swenson to another theft of recording equipment. On July 3, 1996, the police received a "Crime Stoppers Tip" advising police that Swenson called David Loucks' recording studio from Swenson's home telephone on February 24, 1995, that Swenson called the studio several times around David Loucks' death, and that Swenson was involved in two other thefts of recording equipment in the Seattle area. The tipster also provided Swenson's home telephone number.

On July 6, 1996, after meeting with Allan Loucks, King County Deputy Prosecutor Patty Eakes told police that it might be important to obtain a subpoena for Swenson's phone records. Shortly thereafter, a warrant was issued for Swenson's arrest in connection with recording equipment stolen in Redmond, Washington. The police called Allan Loucks and informed him that the police would interview Swenson once he was arrested on the theft charges.

In September 1996, Allan Loucks met with Eakes. At that point, he was so angry that the police had not obtained Swenson's phone records on their own that he provided her with the dates and times that David Loucks' studio had been called from Swenson's former Spokane phone number, and the length of the calls. On October 14, 1996, Allan Loucks followed Swenson's girl friend home from her place of work to an apartment building. After Allan Loucks spotted Swenson, he called the Spokane Police Department. The police arrived at the apartment and arrested Swenson on the outstanding warrant related to the theft charges.

The next day, Eakes and Detectives Lima and O'Keefe

traveled to Spokane, and confronted Swenson with the information provided by Allan Loucks and the fact that they now had his fingerprints. Swenson eventually admitted that he was at the studio on the night David Loucks was killed. Swenson then gave a taped statement to the police, implicating someone named "Joe" in David Loucks' death. Swenson later identified "Joe" as Joseph Gardner. The police interviewed Gardner, who was already in prison for another crime, and Gardner implicated himself and Swenson in the robbery at David Loucks' studio.

Based on the information obtained from Swenson and Gardner, the police obtained several search warrants. With the search warrants, the police seized Swenson's phone records—which confirmed the information provided to Eakes by Allan Loucks—a stun gun from Swenson's apartment, and various pieces of recording equipment. The State charged Swenson and Gardner with first degree felony murder, based on the underlying felony of robbery or attempted robbery. Before trial, Gardner pleaded guilty.

## CrR 3.6 Hearing

Swenson moved to suppress the phone records and his subsequent statements to police, contending that Allan Loucks was acting as a government agent when Allan Loucks obtained initial information from Swenson's phone records. At the CrR 3.6 hearing, Allan Loucks testified that the police never told him, directly or indirectly, that they wanted Swenson's phone records. Detective Lima testified that he was concerned about how Allan Loucks was getting his information but did not want to know his sources. In addition, Detective Lima testified that he never asked Allan Loucks, directly or indirectly, to obtain any phone records and repeatedly discouraged Allan Loucks from continuing his investigative efforts. Detective Lima, however, also testified that he told Allan Loucks that the police could not obtain telephone records without probable cause, in response to a statement by Allan Loucks that the police

needed to get phone records for certain individuals. The trial court denied Swenson's motion to suppress, concluding that Allan Loucks was not acting as a government agent and even if he were, Swenson's phone records would have been inevitably discovered by the police.

## Medical Examiner's Testimony

At trial, the medical examiner testified that David Loucks died around 9:30 or 10 P.M. on March 7, 1995. His death was caused by strangulation and probable suffocation. David Loucks suffered a blunt force injury to the head and numerous abrasions on his head, face, shoulder, elbow, and knees. The abrasions could have been caused by a stun gun, which would cause general incapacitation and some pain.

## Allan Loucks, Jr.'s Testimony

Allan Loucks, Jr., David Loucks' brother, testified that he saw Swenson and an African-American male at his brother's studio on March 7, 1995, around 7:30 P.M. Allan Loucks, Jr. also confirmed that the recording equipment seized by the police was the equipment missing from David Loucks' studio.

## Joseph Gardner's Testimony

Joseph Gardner testified that Swenson called and asked if he wanted to make some money by stealing recording equipment. Swenson told Gardner that he had made an appointment to record some music at a Seattle studio. Gardner agreed, and they went to David Loucks' studio. Swenson brought a stun gun, duct tape, and a screwdriver. Swenson told Gardner that they would have to knock David Loucks unconscious because there was no back door to sneak the equipment out of the studio.

Inside the studio, they waited for an unidentified person, presumably Allan Loucks, Jr., to leave. After David Loucks

sat down, Gardner approached him from behind and put him in a "sleeper" hold to render him unconscious. As David Loucks struggled to get free, Swenson shocked him with a stun gun. David Loucks became lethargic and Swenson started tying him up with duct tape. Gardner then put duct tape over David Loucks' mouth. David Loucks' nose was not bleeding at the time.

Gardner left David Loucks alone with Swenson to carry equipment to their car. When he returned, David Loucks' nose was bleeding. Gardner went in and out of the studio several times carrying the equipment. After getting the equipment they wanted, they drove back to Spokane.

### Shawn Swenson's Testimony

Swenson testified that he reluctantly agreed to participate in a series of thefts to pay off a debt. Swenson scheduled an appointment with David Loucks using the name Paul Waller. The purpose of the appointment was to allow Gardner to see the studio for himself. Before Swenson and Gardner went into the studio, Swenson told Gardner he would not go if Gardner planned to use force to take the equipment. They entered the studio together, but left shortly thereafter to get some beer. Swenson tried to convince Gardner that it was impossible to steal the equipment with David Loucks present and that they should just leave. Gardner convinced Swenson to go back into the studio so that he could get a better look around. Back at the studio, Swenson went into the voice room to practice rapping when he saw Gardner attack David Loucks. He ran out of the voice room and told Gardner to stop. Gardner did not, and Swenson ran out of the studio. Swenson wanted to go back and help David Loucks, but was afraid that Gardner would attack him.

### Verdict and Sentencing

The jury found Swenson guilty of first degree murder. The trial court imposed a 666-month exceptional sen-

tence—double the high end of the standard range—based on its finding that Swenson acted with deliberate cruelty.

## DECISION

### I. Government Agent

Swenson contends that the information from his phone records, which Allan Loucks—the victim's father—provided to the police, was seized in violation of the Fourth Amendment to the U.S. Constitution and article I, section 7 of the Washington Constitution. Therefore, he contends that the information and his subsequent postarrest statements to police must be suppressed: "All evidence, including postarrest statements, obtained directly or indirectly through the exploitation of an illegal search must be suppressed, unless the relationship between the search and the evidence had 'become so attenuated as to dissipate the taint.'" *State v. Birdsong*, 66 Wn. App. 534, 539-40, 832 P.2d 533 (1992) (citations omitted). The State does not dispute Swenson's contention that the police could not have legally obtained the information from Swenson's phone records themselves without a warrant.

■ ■ The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution protect individuals from unreasonable searches and seizures by the government. *State v. Young*, 123 Wn.2d 173, 178, 867 P.2d 593 (1994). If the government obtains evidence through an illegal search, unless admissible under the inevitable discovery doctrine, the evidence and the fruits of the evidence must be suppressed. *State v. Richman*, 85 Wn. App. 568, 570, 933 P.2d 1088 (1997) (citing *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)). If, however, a private citizen obtains evidence through illegal means and provides it to the government, the evidence may be used against the defendant, unless the private citizen was acting as an instrumentality or agent of the government. *State v. Walter*, 66 Wn. App. 862, 866, 833 P.2d 440 (1992); *State v. Clark*, 48 Wn.

App. 850, 855-56, 743 P.2d 822 (1987) (citing *Burdeau v. McDowell*, 256 U.S. 465, 41 S. Ct. 574, 65 L. Ed. 1048 (1921)). Put simply, law enforcement officers cannot use private citizens to obtain evidence without a search warrant where a search warrant would otherwise be required.

██ The defendant bears the burden of proving that a private citizen who provides evidence to the government was acting as an instrumentality or agent of the government. *Walter*, 66 Wn. App. at 866 (citing *Clark*, 48 Wn. App. at 856). "Whether or not a person is acting as the State's instrumentality depends on the particular circumstances of the case." *Clark*, 48 Wn. App. at 856; *accord State v. Thetford*, 109 Wn.2d 392, 400, 745 P.2d 496 (1987); *State v. Dold*, 44 Wn. App. 519, 522, 722 P.2d 1353 (1986). "Critical factors in determining whether a private person acts as a government agent include [1] whether the government knew of and acquiesced in the intrusive conduct and [2] whether the party performing the search intended to assist law enforcement efforts or to further his [or her] own ends." *Clark*, 48 Wn. App. at 856 (citing *United States v. Miller*, 688 F.2d 652 (9th Cir. 1982)); *accord Walter*, 66 Wn. App. at 866. If the court answers both queries in the affirmative, then the private citizen was acting as a government agent when he or she conducted the search. *See United States v. Reed*, 15 F.3d 928, 931-33 (9th Cir. 1994) (citing *Miller*, 688 F.2d at 657); *but see Dold*, 44 Wn. App. at 522 ("No per se rule can be formulated to determine if a private citizen is acting as an agent of governmental authorities.").

In this case, Allan Loucks' conduct clearly satisfies the second part of the so-called *Miller* test. Although Allan Loucks had a personal interest in identifying his son's killer or killers, he obtained Swenson's phone records to assist law enforcement officers in their investigation. Therefore, the only question is whether Swenson has met the first part of the *Miller* test—did the government know of and acquiesce in Allan Loucks' obtaining Swenson's phone records?

██ Swenson contends that Allan Loucks' investigation

was not independent of the police department's investigation, and that the police acquiesced and encouraged Allan Loucks' illegal seizure of Swenson's phone records by accepting other information that the police suspected was obtained by Allan Loucks through illegal means. But even if this court accepts Swenson's characterization of the testimony from the CrR 3.6 hearing, this does not establish that Allan Loucks was acting as a government agent when he obtained Swenson's phone records.

" '[M]ere knowledge by the government that a private citizen might conduct an illegal private search without the government taking any deterrent action [is] insufficient to turn the private search into a governmental one.' " *State v. Smith*, 110 Wn.2d 658, 666, 756 P.2d 722 (1988) (second alteration in original) (quoting *State v. Agee*, 15 Wn. App. 709, 714, 552 P.2d 1084 (1976), *aff'd*, 89 Wn.2d 416, 573 P.2d 355 (1977)). "It must be shown that the State in some way 'instigated, encouraged, counseled, directed, or controlled' the conduct of the private person." *Smith*, 110 Wn.2d at 666 (quoting *State v. Wolken*, 103 Wn.2d 823, 830, 700 P.2d 319 (1985)).

■ In this case, although one could conclude from the conflicting evidence that the police encouraged Allan Loucks to help them with their investigation, there is no evidence that the police instigated, encouraged, counseled, or directed Allan Loucks to obtain Swenson's phone records. In fact, the evidence shows that Allan Loucks was continually frustrated at police failure to take advantage of the information he provided regarding the phone records, and that the police did not seize the records until they were able to obtain a search warrant based on their interviews with Swenson and Gardner. Moreover, Swenson does not even challenge the trial court's finding that "[t]he police never articulated for Mr. Loucks any specific type of information they were seeking in their own investigation." Clerk's Papers at 69. Without some evidence that the police indicated to Allan Loucks that they wanted Swenson's phone records, it cannot be said that the police were using Allan Loucks to obtain evidence without a search warrant where

a search warrant would otherwise be required. Therefore, the trial court's finding that Allan Loucks was not acting as a government agent when he obtained Swenson's phone records is supported by substantial evidence, and the trial court properly denied Swenson's motion to suppress.

## II. WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51

A person is guilty of the substantive crime committed by another if he or she acts as an accomplice. RCW 9A-.08.020(1), (2).

> A person is an accomplice of another person in the commission of a crime if:
>
> (a) With knowledge that it will promote or facilitate the commission of the crime, he
>
> (i) solicits, commands, encourages, or requests such other person to commit it; or
>
> (ii) aids or agrees to aid such other person in planning or committing it[.]

RCW 9A.08.020(3); *State v. Rice*, 102 Wn.2d 120, 125, 683 P.2d 199 (1984).

Prior to 1994, WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51 (WPIC) closely paralleled RCW 9A.08-.020(3):

> "A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
>
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
>
> (2) aids or agrees to aid another person in planning or committing the crime."

WPIC 10.51 (Supp. 1986), *quoted in State v. Crisler*, 73 Wn. App. 219, 224, 868 P.2d 204 (1994), *aff'd sub nom. State v. Gocken*, 127 Wn.2d 95, 896 P.2d 1267 (1995). In both the accomplice liability statute and the former WPIC 10.51, the use of "the" relates back to the crime charged, i.e., the crime to which the person is an accomplice due to his or her

actions to promote or facilitate that crime.

In 1994, the Supreme Court Committee on Jury Instructions amended WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51 to the instruction that was given in this case:

> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of a crime, he or she either:
>
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
>
> (2) aids or agrees to aid another person in planning or committing a crime.

Clerk's Papers at 34 (Jury Instruction 13); *see also* WPIC 10.51, 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 157 (2d ed. 1994). Under this instruction, a defendant may be held liable as an accomplice if the defendant generally knew that his or her actions would promote or facilitate *any* crime, rather than the substantive crime to which the defendant is alleged to be an accomplice. Therefore, the revised WPIC 10.51, in comparison with the language of the accomplice liability statute, arguably requires the State to prove too little—notwithstanding well-established case law that an accomplice runs the risk that the principal will exceed the scope of the preplanned activity—case law that is sometimes referred to by the maxim "in for a dime, in for a dollar." *E.g.*, *State v. Davis*, 101 Wn.2d 654, 658, 682 P.2d 883 (1984) ("As to the substantive crime, the law has long recognized that an accomplice, having agreed to participate in a criminal act, runs the risk of having the primary actor exceed the scope of the preplanned illegality.").

We do not need to resolve the issue of whether the revised WPIC 10.51 and the accomplice liability instruction given in this case misstate the law of accomplice liability to resolve this appeal, for Swenson was convicted of first degree felony murder under instructions that, read as a whole, required the State to prove beyond a reasonable doubt that Swenson was a principal in the underlying crime

of robbery or attempted robbery in the first or second degree. The "to convict" instruction provided:

> To convict the defendant of the crime of murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 7th day of March, 1995, David Gregory Loucks was killed;
>
> (2) That the defendant was committing or attempting to commit Robbery in the First Degree or Robbery in the Second Degree;
>
> (3) That the defendant or an accomplice caused the death of David Gregory Loucks in the course of or in furtherance of such crime or in immediate flight from such crime;
>
> (4) That David Gregory Loucks was not a participant in the crime; and
>
> (5) That the acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Instruction 3, Clerk's Papers at 24. The jury was also instructed on the definitions of robbery, theft, robbery in the first degree, robbery in the second degree, bodily injury, attempted robbery in the first and second degrees, knowledge, and intent.

In addition, the jury was instructed that "a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of the crime." Instruction 12, Clerk's Papers at 33. The jury was also instructed as to the affirmative defenses to first degree felony murder:

> It is a defense to a charge of Murder in the First Degree based upon committing or attempting to commit Robbery that the defendant:

(1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

(2) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury; and

(3) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(4) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

This defense must be established by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that the defendant has established this defense, it will be your duty to return a verdict of not guilty.

Instruction 15, Clerk's Papers at 36.

Our Supreme Court has held in a second degree felony murder case with the predicate crime of second degree assault that an accomplice liability instruction that relieves the State of proving every essential element of the crime beyond a reasonable doubt is not susceptible to harmless error analysis and requires reversal. *State v. Jackson*, 137 Wn.2d 712, 726-27, 976 P.2d 1229 (1999). In *Jackson*, the jury was effectively instructed that a parent is an accomplice in the commission a crime if the parent fails to fulfill his or her duty to aid his or her child who is being assaulted or criminally mistreated by another. *Id.* at 720. The court concluded that the Legislature had not intended to extend accomplice liability to one who fails to fulfill a duty to come to the aid of another. *Id.* at 722. Because the instruction allowed the jury to find accomplice liability based on mere presence and knowledge of the criminal activity rather than participation in that activity, it relieved the State of its burden to prove an essential element of second degree

felony murder. Thus, the error was not susceptible to harmless error analysis. *Id.* at 727.

In *State v. Stein*, 94 Wn. App. 616, 972 P.2d 505 (1999), the defendant was charged with conspiracy to commit first degree murder, first degree felony murder, aggravated first degree murder and, based on vicarious liability, four additional counts of criminal attempts to commit first degree murder. The jury acquitted the defendant of conspiracy to commit first degree murder, first degree felony murder and aggravated first degree murder, but convicted him of the four additional counts of attempting to commit first degree murder. The accomplice liability instructions mirrored the statute rather than the revised WPIC 10.51. But the jury was also given the so-called *Pinkerton* instructions with respect to vicarious liability based on conspiracy.[2] The jury was not told to consider the *Pinkerton* instructions only with respect to the conspiracy charge. Under the *Pinkerton* doctrine, a defendant who is acquitted of conspiracy cannot be liable for the substantive crimes committed by the other alleged coconspirators. *Stein*, 94 Wn. App. at 624. The jury acquitted Stein of the conspiracy charge, and could have convicted him of the attempted murder charges based on the *Pinkerton* instructions regarding vicarious liability rather than the instructions based on Washington's accomplice liability statute. The *Stein* court rejected the State's contention that the *Pinkerton* instructions contained virtually the same standards of vicarious liability as does the Washington statute on accomplice liability. *Id.* at 626-28. The *Stein* court concluded that the error was tantamount to omitting an essential element of the charged crimes because it relieved the State of its burden to prove accomplice liability beyond a reasonable doubt; therefore, the error was not susceptible to harmless error analysis. *Id.* at 628.

■ ■ Swenson argues that under *Jackson* and *Stein*, automatic reversal is required because the alleged error in the accomplice liability instruction relieved the State of its

___

[2] *See Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

burden to prove he was an accomplice to the underlying crime of robbery. But in the instant appeal, Swenson was charged with first degree felony murder as a principal. The Information alleged that Swenson, while committing and attempting to commit robbery in the first and second degree, and in the course of and in furtherance of the crime and in immediate flight therefrom did cause the death of David Loucks. Clerk's Papers at 1. Under RCW 9A-.32.030(1)(c), a person is guilty of first degree felony murder if, while engaged in a specified felony, he or another participant in the felony causes the death of another person who is not a participant in the felony. As our Supreme Court observed in *Rice*, 102 Wn.2d at 125 "[t]he felony murder statute expressly establishes the nonkiller participant's complicity in the homicide as a principal. Therefore, as these defendants were charged as principals, any accomplice liability instruction was not relevant to the crime charged."[3]

The state of mind necessary to prove felony murder is the same state of mind necessary to prove the underlying felony. *E.g.*, *State v. Wanrow*, 91 Wn.2d 301, 311, 588 P.2d 1320 (1978). Here, the underlying felony was robbery and the jury was instructed that a person "commits the crime of robbery when he or she unlawfully and with intent to commit theft thereof takes personal property from the person or in the presence of another against that person's will by the use or threatened use of immediate force, violence or fear of injury to that person[.]" Instruction 4, Clerk's Papers at 25. By his own testimony, Swenson

---

[3] *Cf. State v. Langford*, 67 Wn. App. 572, 837 P.2d 1037 (1992) in which the defendant was charged with and convicted of second degree felony murder as an accomplice. Defendant argued that he could not be an accomplice to second degree felony murder because he intended only to assist the principal in engaging in a fist fight and had not known that the principal would pull a knife and fatally stab the victim. Analogizing *Davis*, 101 Wn.2d at 658-59, wherein the Supreme Court held that the accomplice liability statute premised criminal liability on the accomplice's general knowledge he was assisting the principal in committing a crime, not upon his specific knowledge of the elements of the principal's crime, the *Langford* court held that the defendant could be liable as an accomplice to second degree felony murder based on assault even though he did not know the means by which the principal intended to accomplish the assault. *Langford*, 67 Wn. App. at 580.

intended to commit theft of the recording equipment when he entered Loucks' recording studio on the night of the murder. His testimony that he told Gardner not to take the equipment if force would be required does not negate his intent to commit theft—the same state of mind that is necessary to robbery. Thus, even if the jury believed Swenson's testimony that he intended only to commit "a crime" (theft) and did not know that Gardner intended to commit "the crime" (robbery—that is theft by the use of force), Swenson had the requisite state of mind for the underlying crime of robbery—and could be found guilty of felony murder as either a principal or as an accomplice. We conclude that any error in the current version of WPIC 10.51 was harmless beyond a reasonable doubt because it did not relieve the State of its burden to prove beyond a reasonable doubt that Swenson was a participant in the robbery of David Loucks.

We do not believe that the Supreme Court in *Jackson*, 137 Wn.2d at 726-27, intended to set down a bright-line rule that *every* error contained in an accomplice liability instruction necessarily requires reversal. Rather, we conclude that such error may be harmless and that harmless error analysis is inappropriate only when the error relieves the State of its burden of proof where it seeks to convict a defendant as an accomplice.

Here, Swenson was charged as a principal. The instructions as a whole held the State to its burden of proof in this regard. But even if the jury believed that Swenson was an accomplice to Gardner as the principal, the alleged error in the accomplice liability instruction was harmless because it did not relieve the State of its burden to prove that Swenson had the requisite intent for robbery—that being the intent to commit theft of Loucks' recording equipment. The felony murder statute is harsh, for it provides for strict liability when a participant commits or attempts to commit robbery in the first or second degree and another participant causes the death of a nonparticipant in the course of the crime. In the case of felony murder with the predicate crime of

robbery, the maxim "in for a dime (theft) in for a dollar (robbery)" is good law. *Cf. Rice*, 102 Wn.2d at 125-26 (Even assuming the defendants were charged as accomplices to felony murder rather than as principals, the State would have been required to prove only their knowledge of their coparticipant's criminal assault upon the victim and it would have been unnecessary for the State to prove the defendants' actual knowledge of their coparticipant's possession of a deadly weapon or his mental intent.) (citing *Davis*, 101 Wn.2d 654).

We affirm Swenson's conviction of first degree felony murder. The remainder of our opinion lacks precedential value and will not be published in the Washington Appellate Reports but will be filed for public record pursuant to RCW 2.06.040.

WEBSTER and APPELWICK, JJ., concur.

Reconsideration denied March 12, 2001.