IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint Petition of:<br><br>STEVEN MAURICE MARSHALL,<br><br>               Petitioner. | No. 81659-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Steven Marshall was convicted of murder in the first degree with a firearm enhancement and unlawful possession of a firearm in the second degree, which this court affirmed on direct appeal. He subsequently filed this personal restraint petition (PRP) claiming ineffective assistance of counsel based on representation before and during trial. He also argues that ineffective assistance should be presumed because of his attorney's subsequent resignation in lieu of discipline from the state bar association. Marshall fails to establish either that counsel was deficient or that he was prejudiced by counsel's representation. Therefore, we deny his petition.

FACTS

A jury found Marshall guilty of one count of murder in the first degree with a firearm enhancement and one count of unlawful possession of a firearm in the second degree for the murder of Ryan Prince. These convictions were affirmed

by this court on direct appeal. State v. Marshall, No. 76119-6-I (Wash. Ct. App.

Mar. 25, 2019) (unpublished),

https://www.courts.wa.gov/opinions/pdf/761196.pdf.

The underlying facts and procedural history were set out in Marshall's

direct appeal as follows:

> Ryan Prince helped Michael Helsel-Perkins (Perkins) build medical marijuana dispensaries and manage the dispensaries' employees. Prince lived with Perkins and Perkins's girlfriend, Chelsea Dew, at a house in Renton.
> . . . .
> Dew . . . found Prince on the floor in his bedroom with a bloody face and blankets covering his body. Dew called 911. Prince was pronounced dead at the scene. Police collected a pair of broken Burberry-brand eyeglasses on the front porch, which Dew testified did not belong to her, Perkins, or Prince. Both Marshall's brother and ex-wife testified that Marshall sometimes wore Burberry glasses. The only latent print on the glasses matched Marshall's thumb. Someone had removed the alarm system's DVR[1] from the downstairs closet. Police found $27,000 in cash in Prince's backpack in his bedroom.
> Police also found a 40-caliber bullet embedded in the bathroom closet, a 40-caliber shell casing just outside the house, a 22-caliber casing in a groove between planks on the porch and on the downstairs landing, a 380-caliber casing in the dining room, and a 40-caliber casing in the dining room. A medical examiner performed an autopsy on Prince and determined that he died from multiple gunshot wounds. She found four gunshot wounds and recovered three bullets from Prince's body.
> Police found Prince's cell phone off the side of the road near his house. On Prince's phone they discovered a photograph of a vehicle taken at 8:10 p.m. the night of his murder. The license plate number belonged to a Chrysler PT Cruiser registered to Allison Sierra, Marshall's ex-wife. She testified that Marshall had been the full-time driver of the PT cruiser since September 2013. She stated that he had been driving it on February 14, 2014, when she last saw him before the incident.
> On February 22, the police stopped and arrested Marshall while he was driving a Dodge Durango registered to a girlfriend,

---

[1] Digital video recorder.

Shamarra Scott. Police seized "several" cellular phones from Marshall's person and another that was on the ground near the driver's door of the Dodge. They found a 40-caliber SIG Sauer handgun in a backpack on the front passenger seat. They also found an envelope, an identification card, and a prescription pill bottle with Marshall's name in this backpack. Marshall's DNA (deoxyribonucleic acid) was found on the magazine and ammunition inside the gun. Testing showed that this gun fired the 40-caliber bullet and shell casings found at Prince's house.

Police also searched the contents of Marshall's cell phones and the cell phone of Ryan Erker, Marshall's co-defendant. Marshall and Erker exchanged several text messages and calls with one another using these phones. Their text messages suggested that Erker was monitoring Perkins's dispensaries and attempting to locate his house. On February 6, 2014, Erker sent Marshall a message stating, "Brother, I think I've got the address we've been looking for! I'm having it checked tonight. . . . Keep your fingers crossed. This is the big one." On February 12, Erker texted Marshall, "We know where the honey pot is, so we got time, bro." Marshall responded, "Yeah. We'll put it off for another day. Let's shoot for tomorrow."

Cell tower evidence showed primarily Erker's phone and sometimes Marshall's phone connected to the tower closest to Prince's house periodically between February 7 and 17, 2014. Neither phone had connected to the tower closest to Prince's house before February 7. And neither phone connected to that tower after February 17. On February 17, between 8:00 p.m. and 8:40 p.m., Erker and Marshall placed multiple calls to each other. Each of their phones connected to the cell tower closest to Prince's house for some of these calls. At 8:13 p.m., both Erker's and Marshall's cellular numbers connected to the tower closest to Prince's house. Erker called Marshall several times between 8:37 p.m. and 8:41 p.m. All these calls connected to a tower west of the tower closest to Prince's house.

. . .

The jury found him guilty of first degree murder and returned a special verdict finding that he was armed with a firearm during the crime. At a bifurcated bench trial, the trial court found Marshall guilty of second degree unlawful possession of a firearm.

Marshall, No. 76119-6-I, slip op. at 2-5. The court sentenced Marshall to

concurrent prison terms of 374 months for the murder and 16 months for the

unlawful firearm possession, and an additional 60 months for the firearm enhancement which was run consecutively, for a total of 434 months in prison.

In his direct appeal, Marshall argued the court had violated his right to access the courts by refusing to hear pro se motions he had filed on his own behalf. Id. at 6-14. He claimed the court then erred by admitting testimony about his pro se motions in violation of ER 403. Id. at 14. He also alleged prosecutorial misconduct when the prosecutor elicited a lay witness opinion about Marshall's guilt. Id. at 15-20. In a statement of additional grounds, Marshall asserted that (1) the police conducted an illegal stop, seizure, and interrogation of his ex-wife, Allison Sierra; (2) Sierra's interrogation violated spousal privilege; (3) the State illegally intercepted his mail to and from the jail without a warrant; (4) trial counsel was deficient for not moving to suppress evidence from Sierra's cell phone; (5) trial counsel was deficient for not challenging a juror whose friend had died in a home invasion; (6) trial counsel was deficient for not requesting lesser-included offense instructions; and (7) a witness's testimony regarding a statement by Marshall's co-defendant violated his Sixth Amendment right to confront witnesses. Id. at 20-22.

On direct appeal, regarding his pro se motions, we held that Marshall had no right to "hybrid" representation or to file motions on his own behalf while represented by counsel, and also that he had not properly preserved his ER 403 claim. Id. at 12. We concluded that Marshall failed to object to the alleged prosecutorial misconduct and any misconduct was not so flagrant and ill-

intentioned that it could not have been cured by a jury instruction. Id. at 19-20. We also rejected Marshall's additional grounds. Id. at 20-22.

Marshall's convictions became final on August 23, 2019. He timely filed this personal restraint petition on July 17, 2020.

DISCUSSION

This court will grant a personal restraint petition (PRP) if a petitioner is subject to unlawful restraint. RAP 16.4(a). Relevant to Marshall's PRP, restraint is unlawful if it violates the Constitution of the United States or the Constitution or laws of the State of Washington. RAP 16.4(c)(2). Relief by way of a collateral challenge to a conviction is extraordinary, and a petitioner must meet a high standard before this court will disturb an otherwise settled judgment. In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011).

A collateral challenge may raise both constitutional and nonconstitutional errors. In re Pers. Restraint of Elmore, 162 Wn.2d 236, 251, 172 P.3d 335 (2007). For a PRP based on a constitutional error, a petitioner must show that a constitutional error occurred and the error resulted in actual and substantial prejudice. In re Pers. Restraint of Williams, 198 Wn.2d 342, 353, 496 P.3d 289 (2021). A petitioner who alleges unlawful restraint based on nonconstitutional error must demonstrate a fundamental defect resulting in a complete miscarriage of justice. Elmore, 162 Wn.2d at 251.

I.  Issues Previously Addressed on Direct Appeal

As a general rule, a collateral attack on a criminal conviction cannot simply be a reiteration of issues resolved at trial or on direct appeal. In re Pers. Restraint of Gentry, 137 Wn.2d 378, 388-89, 972 P.2d 1250 (1999). "The petitioner in a personal restraint petition is prohibited from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue." In re Pers. Restraint of Davis, 152 Wn.2d 647, 671, 101 P.3d 1 (2004). Instead, a PRP petitioner "should raise new points of fact and law that were not or could not have been raised in the principal action." Gentry, 137 Wn.2d at 388-89. A "new" issue is not created merely by supporting a previous ground for relief with different factual allegations or with different legal arguments. Davis, 152 Wn.2d at 671. Similarly, a petitioner cannot recast an issue previously resolved on direct appeal by claiming ineffective assistance of counsel. In re Pers. Restraint of Benn, 134 Wn.2d 868, 906, 952 P.2d 116 (1998)). "Simply recasting an argument in that manner does not create a new ground for relief or constitute good cause for reconsidering the previous rejected claim." Id.

Marshall's petition renews or recasts several issues previously reviewed and rejected by this court. On direct appeal, Marshall claimed "deficient performance on the ground that his trial counsel did not ask the trial court to suppress the evidence from [his ex-wife's] phone" and, relatedly, "that the police conducted an illegal pretextual stop, an illegal seizure, and an illegal custodial interrogation of [his ex-wife]." Marshall, No. 76119-6-I, slip op. at 21, 23. We

6

reviewed Marshall's claim and noted, " 'A defendant may challenge a search or seizure only if he or she has a personal Fourth Amendment privacy interest in the area searched or the property seized.' " Id. at 21 (quoting State v. Goucher, 124 Wn.2d 778, 787, 881 P.2d 210 (1994)). We then determined that "[b]ecause the stop and interrogation of [Marshall's ex-wife] and the search of her cell phone implicate [her] privacy interest, not Marshall's, he does not have standing to challenge this conduct under the Fourth Amendment." Id. at 21. Here, Marshall again alleges trial counsel was deficient for both failing to move to exclude evidence and failing to object to the same evidence because it was found based on the search warrant obtained with Sierra's assistance. We decline to revisit this issue as it was previously addressed in his direct appeal.

Marshall also claims counsel was deficient by failing to object to the introduction of his pro se motions as evidence. On direct appeal, Marshall challenged "the trial court's admission of [his] pro se legal motions as substantive evidence of guilt." Id. at 6. While the court rejected this claim because this specific objection was not properly preserved, it also noted that Marshall's factual assertion—that the court admitted the motions themselves as evidence—was itself erroneous. Id. at 13. While one of Marshall's girlfriends testified that Marshall sent her several proposed motions to type up and submit to the court, the motions themselves were not in evidence. Id. at 9. We will not review an issue that was addressed on direct review and is now recast as ineffective assistance of counsel.

Finally, Marshall alleges ineffective assistance because trial counsel "failed to object to the Crawford [2] violations when the court allowed improper hearsay statements of Mr. Erker." Additionally, Marshall contends that counsel failed to file a motion that would have excluded "hearsay testimony of Erker." But Marshall does not identify the hearsay testimony at issue. The direct appeal did, however, address a confrontation clause challenge to testimony of Paul Steve, who had bought and sold cars for Erker. Id. at 5, 24. Steve testified that Erker called to ask him to sell a PT Cruiser because it had been used in a crime and said that "one of the guys owns the car."[3] Id. at 18, 24. This court declined to consider the claim because the record did not support that Steve provided the quoted testimony. Id. at 25. To the extent Marshall challenges that statement again, we do not review it, as it was raised on direct review. And because Marshall fails to provide any evidence or legal argument in support of any allegedly improper hearsay statements, as required by RAP 10.3(a)(6), we decline to revisit the issue.[4]

## II.    Additional Ineffective Assistance of Counsel Claims

Marshall does, however, also raise claims of ineffective assistance of counsel on some issues not previously raised. Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, a defendant in a criminal proceeding is guaranteed the right to

---

[2] Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (out-of-court testimonial statements by witnesses are inadmissible under the confrontation clause unless the witness is unavailable and the defendant had prior opportunity to cross-examine).

[3] A PT Cruiser was photographed at Prince's house at the time of his murder. Id. at 18.

[4] RAP 10.3(a)(6) requires argument in support of the issues presented for review, including citations to legal authority and references to the relevant facts.

effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); <u>State v. Grier</u>, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). "If a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice" as required to demonstrate unlawful restraint. <u>In re Pers. Restraint of Crace</u>, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

For claims of ineffective assistance, the question is whether counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Strickland</u>, 466 U.S. at 686. The court in <u>Strickland</u> set out a two-part test for ineffective assistance of counsel claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Id.</u> at 687; <u>State v. Thomas</u>, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (adopting <u>Strickland</u> test in Washington). "The threshold for the deficient performance prong is high, given the deference afforded to decisions of defense counsel in the course of representation." <u>Grier</u>, 171 Wn.2d at 33. A defendant alleging ineffective assistance must overcome "a strong presumption that

counsel's performance was reasonable." State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

To succeed on a claim of ineffective assistance of counsel, the defendant must demonstrate that defense counsel's representation fell below an objective standard of reasonableness and the deficient representation resulted in prejudice. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). We strongly presume that counsel's representation was effective. Grier, 171 Wn.2d at 33. Prejudice requires that "there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." McFarland, 127 Wn.2d at 335. Because the defendant must show both deficiency and prejudice, a failure to demonstrate either one will end the inquiry. State v. Classen, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

Effective representation entails certain basic duties, such as the overarching duty to advocate the defendant's cause and the more particular duty to assert such skill and knowledge as will render the trial a reliable adversarial testing process. Strickland, 466 U.S. at 668; In re Pers. Restraint of Tsai, 183 Wn.2d 91, 100, 351 P.3d 138 (2015). Counsel's representation is not required to conform to the best practices or even the most common custom, as long as it is competent representation. Harrington v. Richter, 562 U.S. 86, 105, 131 S. Ct. 770, 788, 178 L. Ed. 2d 624 (2011). If defense counsel's conduct can be characterized as legitimate trial strategy, it cannot be the basis for an ineffective assistance of counsel claim. State v. Ray, 116 Wn.2d 531, 548, 806 P.2d 1220

10

(1991), abrogated on other grounds by State v. Crossguns, 199 Wn.2d 282, 505 P.3d 529 (2022).

However, a defendant can rebut the presumption of reasonable performance by demonstrating that no conceivable legitimate tactic explains counsel's performance. In re Pers. Restraint of Caldellis, 187 Wn.2d 127, 141, 385 P.3d 135 (2016); State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). The relevant question is not whether counsel's choices were strategic, but whether they were reasonable. Roe v. Flores-Ortega, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000); Grier, 171 Wn.2d at 34. This court evaluates the reasonableness of counsel's performance from " 'counsel's perspective at the time of the alleged error and in light of all the circumstances.' " Davis, 152 Wn.2d at 673 (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)).

A.  Failure to Move to Suppress Warrants

Marshall claims that his counsel was ineffective because he did not move to suppress two categories of evidence obtained through search warrants. Failure to bring a motion to suppress is not per se deficient performance. McFarland, 127 Wn.2d at 337. "Counsel may legitimately decline to move for suppression on a particular ground if the motion is unfounded." State v. Nichols, 161 Wn.2d 1, 14, 162 P.3d 1122 (2007). The defendant has the burden to rebut the strong presumption that counsel's representation was effective. McFarland, 127 Wn.2d at 337. To show prejudice, a defendant must demonstrate that the motion to suppress would have been granted if made. Id. at 337 n.4.

11

### 1.   Evidence Obtained Based on Sierra as State's "Agent"

Marshall argues his trial counsel was ineffective because he did not ask the trial court to suppress the evidence obtained pursuant to a search warrant. According to Marshall, the warrant "was illegally obtained not for incorrect information contained therein, but for information police intentionally omitted." Specifically, he notes the affidavit supporting the warrant did not disclose that Sierra acted as the State's "agent" by accompanying detectives to several locations and allowing detectives to listen to her call with Marshall on speakerphone.

The Washington State Constitution and the Fourth Amendment to the United States Constitution protect privacy interests against unreasonable search and seizure. State v. Bowman, 198 Wn.2d 609, 617, 498 P.3d 478 (2021). As a result, warrantless searches and seizures are generally per se unreasonable. Reichenbach, 153 Wn.2d at 131. Protection from unreasonable search and seizure applies to "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." State v. Myrick, 102 Wn.2d 506, 511, 688 P.2d 151 (1984). If no private affair is disturbed, then no violation of the constitutional protection exists. State v. Miles, 160 Wn.2d 236, 244, 156 P.3d 864 (2007).

Marshall alleges Sierra acted as an agent of the police in order to obtain information used in the warrant.[5] "Law enforcement officers cannot use private

---

[5] To the extent Marshall is concerned about the State's basis for stopping and speaking with Sierra, he does not have standing to challenge this conduct, because these actions implicate Sierra's Fourth Amendment and state privacy interests, not his. "Fourth Amendment rights are

12

citizens to obtain evidence without a search warrant where a search warrant would otherwise be required." State v. Swenson, 104 Wn. App. 744, 754, 9 P.3d 933 (2000). The defendant bears the burden of proving that a private citizen was acting as an agent of the government. Id. Factors used to determine whether a private citizen acted as an instrumentality of the government include whether the government knew of and acquiesced to the intrusive conduct and whether the citizen intended to assist law enforcement efforts. Id.

Neither of the police actions involving Sierra required a warrant. Sierra and a police officer drove down a public street to identify Marshall's brother's house. Marshall had no expectation of privacy in the identification of a relative's house from a public street; therefore, a warrant was not required. Similarly, no warrant was required for an officer to listen to Sierra's call with Marshall. One party to a phone call may provide the necessary consent. State v. Corliss, 123 Wn.2d 656, 663-64, 870 P.2d 317 (1994) (informant tilted phone receiver so officer could hear).[6]

Because the police actions to which Marshall objects did not require a warrant, Sierra's participation did not "obtain evidence without a search warrant

---

personal rights which may not be vicariously asserted." State v. Goucher, 124 Wn.2d 778, 787, 881 P.2d 210 (1994) (citations omitted). "A defendant may challenge a search or seizure only if he or she has a personal Fourth Amendment privacy interest in the area searched or the property seized." Id. On direct appeal, Marshall alleged "that the police conducted an illegal pretextual stop, an illegal seizure, and an illegal custodial interrogation of [Marshall's ex-wife]" and that the "police interrogation of [Marshall's ex-wife] violated his privacy right because the spousal privilege statute protects him." This court rejected these claims, holding that spousal privilege did not apply to an ex-wife and that Marshall had no standing to challenge the search and seizure of another individual. Marshall, No. 76119-6-I, slip op. at 21.

[6] Listening to the call also did not violate any constitutional privacy right or the Washington Privacy Act, RCW 9.73.030(1)(a). A call is not "intercepted" when an officer listens through the speaker along with the person participating in the call. Corliss, 123 Wn.2d at 662.

where a search warrant would otherwise be required." Swenson, 104 Wn. App. at 754. Sierra was not acting as an agent of the government in violation of Marshall's constitutional rights. Marshall makes no attempt to show that had his counsel filed a motion for a hearing to suppress the "fruits" of the warrant on the basis that it did not declare Sierra to be the "State's agent,"[7] the court would have granted such a motion. Absent such a showing, Marshall cannot meet his burden to establish counsel's failure to file a fruitless motion caused him prejudice.

### 2. Cellular Phone Records

When police arrested Marshall, they "seized 'several' cellular phones from [his] person and another that was on the ground near the driver's door of the Dodge." Marshall, No. 76119-6-I, slip op. at 21. The State obtained a warrant authorizing the search of Marshall's phones for evidence related to the crime. The phones contained multiple text messages between Marshall and Erker appearing to discuss the planned burglary. The warrant also authorized the State to gather information from Marshall's cell phone carrier for information on his account, including the location history. Separately, the State seized Erker's cell phone, which had photographs and text messages exchanged with Marshall about the location of several medical marijuana dispensaries associated with Prince's employer.[8]

---

[7] Additionally, the affidavit to the warrant detailed Sierra's participation in the drive to identify Marshall's brother's house.

[8] The State represents that Erker's phone was seized pursuant to a valid warrant. As discussed in the direct appeal, Marshall lacks standing to assert any Fourth Amendment violation related to a warrant for the search of Erker's device.

Marshall contends that counsel was deficient for not filing a motion to suppress "cell phone data illegally obtained from Marshall's phone" and failing to object to evidence "illegally obtained without a warrant from Marshall's cell phone." He also alleges that trial counsel was deficient because he did not move to suppress either his or Erker's "cell phone records."[9] Marshall claims that "these records were critical . . . because they established Marshall's a [sic] conversation regarding the victim in the vicinity of the victim's home" and "[w]ithout these records, the state would not have been able to determine Marshall's participation." According to Marshall, the warrant was overbroad and trial counsel was deficient for failing to challenge it.

Marshall provides extensive discussion of the law as it pertains to warrant specificity.[10] But he fails to apply this law to the particulars of the warrant in this case. He makes no reference to the language of the search warrant to demonstrate overbreadth or any other reason to suppress evidence obtained as a result of the warrant. Without more than a recitation of relevant law, Marshall cannot show that the trial court would have granted a motion to suppress as

---

[9] The State argues that the issue of whether trial counsel should have moved to suppress the warrant for overbreadth is untimely raised because it was not raised in Marshall's PRP but only in a supplemental brief after appointment of counsel. RCW 10.73.090 provides that "[n]o petition or motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction."

The pro se initial petition raises the question of whether trial counsel was ineffective for failing to seek to suppress the warrant entirely and for failing to object to the cell phone evidence. Thus, the issue of whether trial counsel should have moved to suppress the same evidence on the same basis is sufficiently similar that we consider the issue timely raised.

[10] Marshall seriously misrepresents both the facts and the holding of State v. McKee, 3 Wn. App. 2d 11, 24, 413 P.3d 1049 (2018). McKee is not an ineffective assistance case, and the court's reversal was not based on ineffective assistance for failure to move to suppress. Id. at 29. Rather, McKee had filed a motion to suppress, and on appeal, raised a Fourth Amendment challenge. Id. at 20. In any case, Marshall fails to explain how the court's analysis of overbreadth applies to the facts in this case.

15

needed to establish ineffective assistance of counsel on this basis. Factual evidence, rather than conclusory allegations, is required. Williams, 198 Wn.2d at 352. Bare allegations without persuasive reasoning or reference to the record cannot demonstrate actual and substantial prejudice to obtain relief from personal restraint. In re Pers. Restraint of Pheth, 20 Wn. App. 2d 326, 332, 502 P.3d 920 (2021).

Without explaining how the law applies to the specific facts of his case, Marshall cannot establish that the court would have granted a motion to suppress the cell phone evidence. Thus, counsel was not deficient for failing to make the motion or object to admission of the evidence. Because he does not demonstrate deficient performance, Marshall cannot establish ineffective assistance of counsel regarding the cell phone evidence.

B. Failure to Object to Other Evidence

Marshall alleges that his trial attorney provided ineffective assistance of counsel by failing to object to the admission of numerous pieces of evidence, including DNA evidence from a gun, Burberry eyeglasses located at the scene, photos recovered from Erker's phone, a weight bar, and DVR cables.

When a defendant claims ineffective assistance based on counsel's failure to challenge the admission of evidence, the defendant must show (1) an absence of legitimate strategic or tactical reasons supporting the challenged conduct, (2) that an objection to the evidence would likely have been sustained, and (3) that the result of the trial would have been different had the evidence not

been admitted. See State v. Saunders, 91 Wn. App. 575, 578, 958 P.2d 364 (1998).

Marshall argues that the admission of these pieces of evidence was irrelevant and unfairly prejudicial. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. All relevant evidence is admissible except as limited by law. ER 402. However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

1. Gun DNA Evidence

Marshall argues that defense counsel should have moved to suppress evidence relating to the .40 caliber[11] SIG Sauer handgun that was located in his vehicle at the time of his arrest.[12] He contends that the evidence was both irrelevant and unfairly prejudicial because the gun and its magazine contained the DNA of six different people on them.[13]

The weapon was recovered from a backpack on the front seat of Marshall's vehicle at the time of his arrest and matched the .40 caliber shell casings found at the scene. Marshall, No. 76119-6-I, slip op. at 4. Marshall

---

[11] Although the opinion from Marshall's direct appeal refers to the caliber of the bullets without a decimal, in keeping with the convention used in the parties' briefing and the trial transcript, which indicates the bullet's diameter, we refer to the bullets with the decimal.

[12] Marshall's initial petition incorrectly refers to this as "the gun found at the crime scene."

[13] It is unclear whether Marshall believes it was the weapon itself or the testimony about it that was inadmissible, or both.

17

contends that information is irrelevant because no .40 caliber bullets were found in Prince's body, and the cause of death was multiple gunshots from .380 and .22 caliber weapons.

Prince suffered four gunshot wounds, and the medical examiner recovered three bullets from his body. Id. at 3. One bullet struck and exited Prince's body. Id. Police recovered only one bullet, a .40 caliber embedded in the bathroom closet in the room where Prince was killed. Id. at 3-4. Testing showed that the gun found in Marshall's backpack fired that bullet. Id. at 4.

If nothing else, the weapon recovered from Marshall's backpack was relevant because it placed Marshall at the crime scene. The State also argues that the testimony regarding the DNA mixture on the gun was relevant to demonstrate the thoroughness of the investigation and that it could not have prejudiced Marshall to have evidence of other individuals' DNA on the weapon as well. While Marshall claims the DNA evidence was confusing, he provides no further argument that any of the gun-related evidence was unfairly prejudicial. Ultimately, Marshall fails to meet his burden to show a reasonable probability that an objection to the gun DNA evidence would have been sustained, or that it would have led to a different outcome.

2. Burberry Glasses

Marshall argues that trial counsel should have moved to suppress the Burberry eyeglasses located at the crime scene. He contends the glasses were irrelevant because the DNA testing on them was inconclusive and contained partial DNA samples from multiple individuals. The State counters that the

18

glasses themselves were relevant because they were identified by a witness as belonging to Marshall and were found at the crime scene with only Marshall's fingerprint on them. As such, testimony regarding inconclusive DNA testing of the glasses did not prejudice Marshall, but instead allowed him to argue that someone else must have carried his glasses to the scene. Counsel's use of this evidence in closing demonstrates a legitimate strategic or tactical reason not to move to suppress the evidence. Marshall cannot establish deficiency in this regard to support his claim of ineffective assistance of counsel. See Davis, 152 Wn.2d at 758 ("Performance is not deficient when counsel's decision not to object to comments introduced into evidence can be characterized as legitimate trial strategy or tactics.").

### 3.  Photographs from Erker's Cell Phone

The evidence recovered from Erker's phone included text messages between Erker and Marshall planning the burglary, as well as photographs of several marijuana dispensaries affiliated with Prince's employer. The State also relied on cell phone location data from Erker's cell phone provider in the days before and after the murder to place him in the proximity of the crime scene.

Marshall argues that he received ineffective assistance because his trial counsel "failed to object to the admission of photos found on Erker's phone." He claims that there was nothing in the record to show their relevance, and the evidence was more prejudicial than probative. The record reflects that the State relied on the photographs to show that Erker and Marshall were working together to plan the burglary. The evidence was highly relevant and probative. Because

19

Marshall fails to show that an objection to admission of Erker's photographs would have likely been sustained, he fails to establish that counsel was deficient for failing to object.

### 4. Weight Bar and DVR Cables

Marshall also contends that trial counsel should have objected to evidence regarding a weight bar and DVR cables as irrelevant. Apart from a single passing reference in Marshall's initial petition, he makes no argument regarding the weight bar, and therefore fails to show that the evidence was either irrelevant or unfairly prejudicial.[14]

The DVR cables were found in a closet under the stairs at Prince's house. The outside of the house was equipped with a video surveillance system, which was wired to a DVR in the closet. The police discovered the cables, but the DVR was missing. Marshall argues the DVR cables were irrelevant because there were no fingerprints or DNA evidence connecting them to him. The cables provided evidence that the DVR for the surveillance system had previously been located in the closet but had been removed. Introduction of the left-behind cables was not prejudicial given the other testimony about removal of the DVR.

Because this challenged evidence was relevant and not unfairly prejudicial, Marshall fails to show that an objection would have been sustained or that the result of the trial would have been different. As such, he fails to establish

---

[14] Prince's body was discovered in his bedroom with the weight bar near his head. The weight bar was normally in Prince's bathroom with his weight set. The State argued the weight bar was used to strike Prince's neck, shattering his hyoid bone.

ineffective assistance of counsel for failing to object to evidence of the weight bar or DVR cables.

### C. Alleged Deficiencies in Pre-Trial Preparation

Marshall alleges that his trial counsel was ineffective due to an overall lack of investigation and pre-trial preparation. In order to rebut the presumption that counsel's performance was reasonable, a defendant bears the burden of establishing the absence of any "conceivable legitimate tactic explaining counsel's performance." Grier, 171 Wn.2d at 42 (quoting Reichenbach, 153 Wn.2d at 130).

In addition to the failure to file certain pretrial motions as alleged above, Marshall claims that counsel failed to interview witnesses,[15] failed to hire an investigator or experts, and had only limited contact with his client before trial. The State contends that Marshall fails to establish any new information that would have been discovered by witness interviews or a professional investigator, or that expert witnesses were necessary or what they would have said. The State also argues that Marshall fails to establish any reasonable probability that the outcome of the trial would have been altered by any additional investigation.

Marshall's arguments are undermined by the actual record. While his argument implies that no such interviews or investigation were done by anyone, the record reflects that his counsel at trial, John Crowley, was not the original attorney on Marshall's case. More than a year after the arraignment, and after

---

[15] Marshall complained that counsel failed both to interview Erker or call him as a witness at trial.

substantial defense investigation and interviews had been completed by his two original attorneys, Marshall successfully moved to discharge them and retained Crowley to represent him. Upon accepting the representation, Crowley would have had access to Marshall's prior counsel's case file and the entirety of the State's discovery. Marshall does not identify any information that was not discovered that might have changed the outcome of the trial. Nor does he specify any witnesses who were not interviewed or who would have testified and changed the outcome of the trial. Marshall has demonstrated neither deficiency nor prejudice relating to Crowley's case preparation.

D.  Medical Condition

Marshall contends that trial counsel concealed a medical condition that caused him to fall asleep twice during trial. He cites as evidence a motion Crowley filed seeking a brief continuance to deal with an "ongoing medical condition," as well as personal declarations of Marshall himself and his mother asserting that they witnessed Crowley during trial with his eyes closed, appearing to be asleep. According to his mother, the judge also looked directly at Crowley while he was sleeping "but said nothing about it." Marshall hypothesizes that this undisclosed medical condition explains Crowley's other alleged deficiencies as well.

The record reflects that on the first day of trial, Marshall's trial counsel filed a motion for a continuance or recess from trial so that he could seek treatment for an ongoing medical condition. However, by the time the parties appeared that day, all agreed that the trial calendar would allow for brief recesses as needed for

22

Crowley to attend any necessary medical appointments. Crowley did not pursue the motion to continue the trial.

First, we note that Marshall's contention that Crowley improperly hid his condition is belied by Sierra's declaration, in which she states that after she reported to Marshall that Crowley said he was ill, Marshall told her "Crowley had told him the same thing." More importantly, counsel is not required to disclose sensitive health information to clients. Crowley did not "conceal" his health condition, as Marshall had no right to this information.

Marshall alleges that it was this medical condition that led Crowley to fall asleep during trial. Allegations of sleeping counsel are serious, and if proven, may support a finding of deficient performance. In re Pers. Restraint of Lui, 188 Wn.2d 525, 540, 397 P.3d 90 (2017); Caldellis, 187 Wn.2d at 145 n.6 (listing cases where counsel was found deficient for having fallen asleep during critical portions of trial). However, to prevail on an ineffective assistance claim, Marshall must prove prejudice as well as deficient performance.

Marshall does not identify any specific critical moment where Crowley was sleeping, nor does he explain how he was harmed.[16] The judge, who had the best view of the courtroom and counsel's behavior, did not admonish Crowley for a lack of attentiveness or sleeping, and there is no obvious sign in the record that

---

[16] In his bar grievance, Marshall stated, "Mr. Crowley dosed [sic] off during trial on two different occasions. The first time was on 10/3/16, during Shavon[ne] Parker's testimony. I noticed he was sleep [sic] when the state offered an exhibit and brought it to Mr. Crowley I had to call his name to get his attention. He also dosed [sic] off again on 10/6/16 at 11:55 a.m. a few minutes before break during Ms. Geil's testimony as well, the firearm specialist." The trial transcripts do not reflect any instances of Crowley sleeping. However, the record does show Crowley conducted significant cross-examination of both Parker and Geil, including re-cross of Parker.

counsel was actually sleeping or otherwise not engaged in the trial. Crowley made objections and cross-examined witnesses during the State's case. Compare Lui, 188 Wn.2d at 541 (noting that the judge is in the best position to assess courtroom behavior and provide appropriate admonishments to both jurors and counsel if there are signs of inattentiveness). Even if Crowley fell asleep at points during the trial, Marshall has failed to show that Crowley's performance resulted in prejudice, as required to establish ineffective assistance of counsel.

E. Disciplinary Investigation

Approximately ten months after Marshall's sentencing, an investigation by the Washington State Bar Association's Office of Disciplinary Counsel (ODC) led to the filing of formal charges of professional misconduct against Marshall's trial attorney, Crowley. The charges stemmed from complaints from four of Crowley's former clients, alleging various instances of lack of communication, misrepresentation, failure to file documents, and financial malfeasance. ODC's final statement of charges against Crowley identified 20 different alleged violations.[17] The grievances spanned a time period between July 2011 and June 2016. Marshall himself had filed a bar grievance against Crowley in December 2016, after his sentencing. However, Marshall's allegations were not included in

---

[17] The charges included multiple violations of the following Rules of Professional Conduct: 1.2 (Scope of Representation / Allocation of Authority Between Client and Lawyer), 1.3 (Diligence), 1.4 (Communication), 1.5 (Fees), 1.15A (Safeguarding Property), 1.16 (Declining or Terminating Representation), 3.2 (Expediting Litigation), 4.1 (Truthfulness in Statements to Others), 8.1 (Bar Admission and Disciplinary Matters), and 8.4 (Misconduct).

ODC's statement of charges against Crowley. In July 2017, Crowley voluntarily resigned his membership in the state bar in lieu of discipline.

In his personal restraint petition, Marshall contends that Crowley "took Marshall's money, lied to Marshall, and never filed any of the motions he promised to file," similar to his behavior in other clients' matters as charged by ODC. Marshall relies on In re Pers. Restraint of Brett, 142 Wn.2d 868, 884, 16 P.3d 601 (2001) (Talmadge, J., concurring), to argue that "counsel's representation of a client falls below an objective standard of reasonableness as a matter of law when the lawyer is disbarred for conduct contemporaneous in time with representation and that conduct affects their representation of that client."

However, this is not an accurate statement of court's holding in that case.[18] Brett does not stand for the proposition that, as a matter of law, counsel's representation falls below a standard of reasonableness when the lawyer is disbarred for contemporaneous conduct. Rather, the majority opinion held that Brett received ineffective assistance, during both the guilt and penalty phases of his murder trial, based on specific actions[19] that were held, individually and in combination, to establish ineffective assistance of counsel. Id. at 882-83. Only

---

[18] Nor is the quotation accurate technically, as it adds and omits material without indicating the alterations to the original.

[19] The Brett court stated, "[W]e conclude that when counsel knew or had reason to know of a mental defect or illness affecting their client in a possible death penalty case, counsel could and should have: (1) promptly sought the appointment of cocounsel; (2) presented a mitigation package to the prosecutor before a death penalty notice was filed; (3) promptly investigated relevant mental health issues; (4) sought a timely appointment of investigators; (5) sought a timely appointment of qualified mental health experts; and (6) adequately prepared for the penalty phase by having relevant mental health issues fully assessed and by retaining, if necessary, qualified mental health experts to testify accordingly." Id. at 882.

the concurrence suggested that disbarment for contemporaneous conduct that affected the attorney's representation of a capital defendant could alone be sufficient. Id. at 884 (Talmadge, J., concurring).

Here, Crowley was under investigation and resigned his bar membership; he was never actually disciplined. Disciplinary investigation does not establish per se ineffective assistance of counsel, particularly when the investigation is about representation in another case. Rather, to prevail on a claim of ineffective assistance of counsel, the petitioner must demonstrate both deficient performance and resulting prejudice in their case. Marshall has not provided evidence of deficiency in his defense. Crowley's performance may have been deficient in contemporaneous cases,[20] but none of Marshall's allegations support a claim of ineffective assistance of counsel in this case.

F. <u>Cumulative Error</u>

Marshall argues that even if no single instance of ineffective assistance of counsel denied him a fair trial, the court should still conclude the cumulative effect of the alleged errors deprived him of his constitutional right to counsel. "The accumulation of errors may deny the defendant a fair trial and therefore warrant reversal even where each error standing alone would not." <u>State v. Davis</u>, 175 Wn.2d 287, 345, 290 P.3d 43 (2012), <u>abrogated on other grounds by State v. Gregory</u>, 192 Wn.2d 1, 427 P.3d 621 (2018). However, the doctrine does not apply when "the errors are few and have little or no effect on the outcome of

---

[20] Indeed, inattention to some clients could allow counsel to provide more attention to other clients such as Marshall.

26

the trial." State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). When there is overwhelming evidence of the defendant's guilt, cumulative errors do not require reversal. In re Pers. Restraint of Cross, 180 Wn.2d 664, 691, 327 P.3d 660 (2014), abrogated on other grounds by Gregory, 192 Wn.2d 1.

Marshall's cumulative error claim relies on the existence of errors that we have determined did not occur. Moreover, there was overwhelming evidence of Marshall's guilt. In the direct appeal, we summarized the evidence of guilt[21] as follows:

> Marshall's and Erker's text messages establish that they located Prince's home, referred to it as the "honey pot," and intended to carry out a plan that required them to locate his home. Cell phone data shows them near Prince's house in the days leading up to the murder and at the time of the murder. In addition, police found Burberry eyeglasses with only Marshall's fingerprint at the scene, witnesses testified that they had seen him wear Burberry glasses, and a Facebook picture shows him wearing Burberry glasses. Sierra testified that since September 2013 Marshall had been the primary user of her PT Cruiser, which was photographed at Prince's house at the time of his murder. And Steve testified that Erker asked him to sell that PT Cruiser on the night of the murder because it had been used in a crime. Further, the gun located in Marshall's backpack fired the bullet and some of the cartridge casings found at the scene. After the murder, Marshall told Bailey that he had "fucked up." And only after Scott received a letter from Marshall stating that police treated her poorly did she file a declaration making this claim.

Marshall, No. 76119-6-I, slip op. at 17-18. In light of this overwhelming evidence, Marshall's counsel's alleged deficiencies neither individually nor cumulatively require reversal.

---

[21] This summary of evidence appears in this court's analysis of prosecutorial misconduct, where it determined that the prosecutor committed misconduct by intentionally eliciting an opinion about guilt. Marshall, No. 76119-6-I, slip op. at 17. This court held that despite the lack of eyewitnesses and though the primary issue was identity, "the other evidence of Marshall's guilt was sufficiently abundant that an instruction could have cured any resulting prejudice." Id.

We deny Marshall's personal restraint petition.

Chung, J.

I CONCUR:

Birk, J.

In the Matter of the Personal Restraint Petition of Marshall, No. 81659-4-I

HAZELRIGG, A.C.J. (concurring) — I join my colleagues as to the analysis and outcome set out in the majority, but write separately to emphasize and respond to three particular points raised in Steven Marshall's petition.

I.      No Requirement for Subsequent Counsel to Re-Interview Witnesses

There is no duty for defense counsel to repeat the interviews or other investigatory work completed by a prior attorney on the case. Qualified and competent defense attorneys may and often do rely on the investigatory materials arising from the pretrial efforts of the prior counsel in a criminal case, e.g., witness interview transcripts, photographs and other recordings, and consultations with experts. At oral argument before this court, when asked whether there was court-appointed counsel who undertook investigative efforts before John Crowley was retained, Marshall stated, "not that I'm aware of."[1] After the State confirmed that there were attorneys handling the case before Crowley, Marshall was asked "if prior counsel conducted interviews, is your suggestion for our holding in this case . . . that subsequent counsel would be required to re-interview?" Marshall responded, "Absolutely."[2] Though Marshall seemingly backtracked from this position upon further inquiry from the panel, such a position requires additional attention.

_____

[1] Wash. Court of Appeals oral argument, In re Pers. Restraint of Marshall, No. 81659-4-I (Nov. 1, 2022), at 8 min., 24 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2022111106.
[2] Wash. Court of Appeals oral argument, supra, at 20 min., 10 sec.

"To provide constitutionally adequate assistance, 'counsel must, at a minimum, conduct a reasonable investigation enabling [counsel] to make informed decisions about how best to represent [the] client.'" In re Pers. Restraint of Brett, 142 Wn.2d 868, 873, 16 P.3d 601 (2001) (emphasis and alterations in original) (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)). "The degree and extent of investigation required will vary depending upon the issues and facts of each case." State v. A.N.J., 168 Wn.2d 91, 111, 225 P.3d 956 (2010). In certain circumstances, defense counsel may decide "that particular investigations are unnecessary." In re Pers. Restraint of Rice, 118 Wn.2d 876, 889, 828 P.2d 1086 (1992). The decision not to investigate a particular issue or witness is "assessed for reasonableness under all the circumstances." Id.

The record before us establishes that Marshall was charged via information in February 2014 and was represented by Marc Stenchever and Steve Adams until May 2015. On March 19, 2015, Marshall moved to discharge counsel; at that point, his attorneys had interviewed two representatives of the medical examiner's office. The trial court denied the motion without prejudice. On April 29, 2015, Marshall again moved to discharge his counsel. At the hearing on the motion, Adams explained that he and Stenchever were actively investigating Marshall's case: "We were in interviews yesterday for three times [sic]. Co-counsel, Mr. Erker's counsel, has requested 10 or 15 other interviews coming up within the next few weeks. We're doing our best to actively investigate this case." The court again denied the motion to discharge. On May 5, 2015, Marshall moved once more to discharge

counsel and the trial court granted the motion, allowing Adams and Stenchever to withdraw and substituting Crowley, whom Marshall had retained to represent him.

As the majority explains, Marshall's court-appointed attorneys had already conducted multiple interviews and were actively investigating the case up until their discharge. When Crowley was retained, he would have had access to all the materials contained in Marshall's case file, including results of the defense investigation up to that point, and discovery from the State under CrR 4.7(a). Investigators retained by prior counsel may be subpoenaed by the attorney conducting trial and serve as impeachment witnesses for the defense. Nothing in the record suggests these materials were insufficient for Crowley to make informed decisions regarding his representation of Marshall and meet the standard of reasonable investigation.

The majority also properly notes that Marshall fails to identify any witnesses who should have been interviewed, but were not, together with an explanation of how such interviews would have improved his defense, or any experts who should have been retained and how they would have bolstered his defense theory. More critically, creation of a rule or standard that, in order to provide effective assistance, subsequent counsel must repeat witness interviews already completed by the prior attorney would upend public defense in our state and create unnecessary hardship for named victims and civilian witnesses. Such a requirement would exponentially prolong existing backlogs in our trial courts across the state, which have already ballooned as a result of the COVID-19[3] pandemic. The practical implications of a

---

[3] 2019 novel coronavirus infectious disease.

rule like the one Marshall appeared to seek here would only serve to further delay justice for the accused and victims of crimes. In addition to failing to satisfy the legal test for such a challenge, the policy arguments against Marshall's claim as presented are insurmountable.

II. Defense Counsel Entitled to Privacy with Regard to Health Information

Marshall's initial petition avers "Crowley concealed this [medical] condition from Marshall" and that the condition caused Crowley to "doze off during trial at least twice." This assertion suffers from several fatal flaws. The first is that Marshall provides no evidence, much less argument beyond the bare conclusion, that connects the allegation that Crowley was asleep during trial to any health issue. Further, as noted by the majority, the record demonstrates that Crowley did, in fact, disclose some facts about his medical condition to Marshall and his former spouse, Allison Sierra, such that the two later discussed the matter and compared the information Crowley had conveyed. More critically, Marshall fails to provide any authority in support of his claim that Crowley had any sort of affirmative duty to disclose his protected health information to his clients.

Lawyers often deal with health conditions, both minor and serious, while still effectively representing their clients, and whether such conditions were disclosed to the clients has no bearing on counsel's diligence or effectiveness. As the majority notes, clients have no right to their attorney's protected health information. Though defense counsel is required to withdraw from representation when a medical condition materially impairs their ability to represent the client, there is no obligation for counsel to disclose the details of that condition to the client. RPC

1.16(a)(2). Legal professionals do not forfeit their right to privacy as to their protected health information by virtue of entering a notice of appearance in a case. Hiring someone to take on legal representation does not entitle the client to personal details of their advocate's life. This remains true in the context of assertions of ineffectiveness of counsel. Marshall concedes in his briefing that the focus is on counsel's "performance," not the presence of a disability. State v. Lopez, 190 Wn.2d 104, 119, 410 P.3d 1117 (2018). Since Lopez was issued, this author has not observed that the litigation of ineffective assistance claims has encroached upon counsel's right to privacy. But that is not a reason to be less vigilant in disallowing such encroachment. As one justice cautioned in Lopez, it would have grave unintended consequences for the provision of robust public defense were it to transpire that counsel should "expect that their mental health or personal stress level will be part of an ineffectiveness and/or malpractice claim." Id. at 134 (Yu, J., dissenting). I agree. The Rules of Professional Conduct governing an attorney's duty as an officer of the court, when their private health concerns impact representation, properly balances the competing needs of protecting both clients and lawyers. Accordingly, it is wholly irrelevant whether Crowley disclosed the specifics of his health condition to Marshall.

III. Disciplinary Investigation in One Matter Does Not Render Counsel Ineffective in Others

Finally, an attorney who is under investigation, formally charged, or ultimately disbarred by the Washington State Bar Association (WSBA) for conduct that occurred contemporaneously with the representation at issue is not per se

ineffective. Such situations do not even give rise to a prima facie showing of ineffective assistance of counsel which is, by design, a fact-specific inquiry which considers the performance of counsel in light of the facts and procedural posture of the case. See In re Pers. Restraint of Davis, 152 Wn.2d 647, 673, 101 P.3d 1 (2004) (reviewing court evaluates reasonableness of counsel's performance "in light of all the circumstances" (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986))).

Marshall relies heavily on Justice Talmadge's concurrence in Brett to support his argument on this issue. In his concurrence, Justice Talmadge opined that, in a capital case, "we should find that counsel's representation of a client falls below an objective standard of reasonableness as a matter of law when that lawyer is disbarred for conduct contemporaneous in time with their representation of a capital defendant and that conduct affects their representation of that client." Brett, 142 Wn.2d at 884 (Talmadge, J. concurring) (emphasis added). Brett's attorney, Irving Lee Dane, was disbarred for "conduct that was contemporaneous with his representation of Brett." Id. Dane submitted a declaration in another case regarding the conduct for which he was disbarred and admitted he was struggling with depression, bipolar disorder, and overall concentration. Id. These issues were present while Dane represented Brett. Id. The concurrence asserted that disbarment under those circumstances was sufficient to show ineffective assistance of counsel as to Dane's representation of Brett. Id. at 885. However, as the majority here makes clear, the Brett majority disagreed: the ultimate holding makes no reference of Dane's disbarment nor does it acknowledge the

- 6 -

concurrence's proposed rule. <u>See</u> 142 Wn.2d at 882-83. Further, as emphasized above, even the concurrence conceded a negative impact on the representation was essential.

As a preliminary matter, in the context of a criminal case that guarantees to the accused the presumption of innocence at all stages of the proceedings from arrest and charging up to the point a verdict is reached, it is an interesting proposition to suggest that this court should apply a presumption <u>against</u> the subject of a WSBA investigation. Further, such a holding would, as with several others sought by Marshall in this petition, disrupt the entirety of the criminal legal system in our state as it would be ripe for abuse. Under his proposal, to secure reversal based on ineffective assistance of counsel, all one would need to do is ask a friend or cell mate or anyone else to file a Bar complaint against defense counsel. Crowley was investigated based on allegations presented to the WSBA. He resigned in lieu of disbarment, so no conclusions were reached by the WSBA Office of Disciplinary Counsel. The <u>Brett</u> concurrence is not controlling authority, nor is it even persuasive given the practical implications it raises.